IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE |
| | NO.  4:12-CR-20-RLV-WEJ |
| GEOFFERY WILLIAM HINE, | |
| Defendant. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Geoffery William Hine's Motion to Suppress Statements [15] and Motion to Suppress Seized Evidence [16].  The Court conducted an evidentiary hearing on said Motions on March 13, 2013 [31], which has been transcribed [32] (hereafter "Tr.").  On the basis of the testimony and documentary evidence produced at the hearing and the briefs of counsel,[1] the undersigned **REPORTS** that no Fourth or Fifth Amendment violations occurred here; therefore, the undersigned **RECOMMENDS** that defendant's Motions be **DENIED**.

---

[1] See Post Hearing Brief in Support of Motion to Suppress [34] (hereafter "Def.'s Br."), and Government's Brief in Opposition to Defendant's Motion to Suppress Statements and Physical Evidence [41] (hereafter "Gov't Resp.").

AO 72A
(Rev.8/82)

## I.   STATEMENT OF FACTS

In April 2012, officers of the Western Australian Police transmitted to agents of the Federal Bureau of Investigation ("FBI") a tip they had received from an anonymous source regarding an Australian citizen (i.e., defendant Hine) who was expected to travel to Rome, Georgia with the intent to have sex with a minor. (Tr. 4-5.) That source also provided the name and address of the victim. (Id. at 5.) After confirming the information provided, which included Mr. Hine's arrival date in Atlanta on April 14, 2012, FBI agents and local law enforcement obtained a state arrest warrant for Mr. Hine. (Id. at 6-7.)

At approximately 6:00 a.m. on the morning of April 14, agents and officers met Mr. Hine's flight at the gate at Hartsfield-Jackson Atlanta International Airport. (Tr. 7.) The passengers were instructed to remain seated while law enforcement boarded the plane, located Mr. Hine, informed him of their identities, placed him under arrest, cuffed his hands behind him, and escorted him from the plane onto the tarmac. (Id. at 7-8, 23-24.) The agents and officers were in plain clothes with guns holstered and not visible. (Id. at 8, 21-22.) Once on the tarmac, the agents and officers placed Mr. Hine into the back seat of one of their vehicles and returned to the airport offices of the Atlanta Police Department. (Id. at 8-9, 23.) This entire

2

encounter took approximately six minutes, during which time Mr. Hine was not questioned and he made no statements. (Id. at 9-10.)

The agents and officers arrived at the Atlanta Police Department's airport offices at approximately 6:07 a.m.. (Tr. 10.) At this point (and later upon arriving in Cartersville, Georgia), agents asked Mr. Hine if he needed a bathroom break or anything to drink or eat. (Id. at 15.) He elected to use the bathroom. (Id. at 24.) When Mr. Hine returned to the vehicle, FBI Special Agent Micah Childers read the Miranda rights to defendant from a card he keeps on his person. (Id. at 11.) Mr. Hine was standing outside of the vehicle near the trunk, while Agent Childers was facing him and standing about four feet away. (Id.) Those Miranda rights, which were read verbatim from the card (id.), provide as follows:

> YOUR RIGHTS
>
> Before we ask questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.

3

> If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov't Ex. 1.) Agent Childers administered these rights orally; Mr. Hine was not asked to read anything. (Tr. 26.) There was no signed Miranda waiver. (Id. at 25.)

According to Agent Childers, Mr. Hine did not appear to be under the influence of any substance, and the agents and officers made no threats or promises to him. (Tr. 12-13.)[2] No guns were drawn or visible. (Id. at 12-13.) Agent Childers added that Mr. Hine spoke and understood English,[3] and not only appeared to understand his rights, but acknowledged them by stating, "I understand." (Id. at 12-13, 30-31.) At no point thereafter did Mr. Hine invoke his rights. (Id. at 13.) After these rights were read to Mr. Hine, an agent moved his handcuffs from rear to front to allow for transport from the airport back to Rome, and he was placed in Detective Jones's vehicle. (Id.) In the meanwhile, the agents and officers retrieved

---

[2] Agent Childers conceded that he did not ask Mr. Hine whether he had been drinking on the plane or whether he had taken a sleeping pill, but they found no evidence of sleeping pills or receipts for the purchase of alcohol. (Tr. 26.)

[3] Numerous text messages and emails exchanged between Mr. Hine and the minor victim–obtained after the interview–were in English. (Tr. 12, 26.)

4

Mr. Hine's backpack from the plane's overhead bins and his suitcase from Delta Air Lines and placed them in the trunk of Detective Jones's vehicle. (Id. at 13-14.)

During the trip to Rome, Detective Jones drove the vehicle, Agent Childers rode in the front passenger seat, and Detective Lom rode in the back seat with Mr. Hine. (Tr. 13.) As they traveled, agents started talking to the defendant. (Id. at 14.) Specifically, Detective Lom "started to talk to [Mr. Hine] a little bit, just asking about–kind of why he was here, why he was in the area, and he began to talk with us some." (Id. at 13, 26-27.) Agent Childers characterized the exchange throughout the ride from the airport to Cartersville as more of a conversation than an interrogation. (Id. at 27.) During this trip Mr. Hine was cuffed in the front, but no one threatened him, made any promises to him, or brandished any weapons. (Id. at 14-15.)[4] Mr. Hine made incriminating statements which the Government may seek to use at trial. (Id. at 3.)

Upon arrival in Rome, agents placed Mr. Hine in an interview room (approximately ten by ten feet in size with a conference table and chairs) and asked

---

[4] Mr. Hine also told the officers about his encounter with the Australian police prior to his departure to the United States, indicating that they told him he should not come to America because there was a high likelihood that he would be arrested upon arrival. (Tr. 20-21.)

5

for consent to search his suitcase, backpack and cellular telephone. (Tr. 15-17, 27.) Agents provided Mr. Hine with two consent forms, one for his suitcase and backpack, the other for his cellular telephone. (Id. at 16-18; see also Gov't Exs. 2-3.)[5]  After being given an opportunity to read both forms, Mr. Hine signed them, granting agents consent to search those items. (Tr. 16-18.)[6] Mr. Hine did not appear sleepy or under the influence of anything when he signed the consent forms. (Id. at 32.) The was no further interrogation of Mr. Hine after he arrived in Rome. (Id. at 28-29, 31.)

## II.   THE INDICTMENT

A grand jury for the Northern District of Georgia returned a two-count Indictment against Mr. Hine. United States v. Geoffery William Hine, Crim. Indict.

---

[5] Both forms contain the following above the signature line:

> I HAVE NOT BEEN PROMISED ANY REWARD OF ANY TYPE.  I HAVE NOT BEEN THREATENED IN ANYWAY [sic] TO FORCE OR COMPEL ME TO GIVE THIS CONSENT.  I UNDERSTAND MY FOURTH AMENDMENT RIGHT.  I FREELY AND VOLUNTARY [sic] GIVE MY CONSENT TO CONDUCT SAID SEARCH TO THE ABOVE OFFICER WITH FULL UNDERSTANDING OF MY RIGHTS AND MY ACTIONS.

(Gov't Exs. 2-3.)

[6] The items seized are listed in Government Exhibit 4. (Tr. 18.)

No. 4:12-CR-20-RLV (N.D. Ga. July 10, 2012) [1]. The Indictment asserts that on or about April 14, 2012, in the Northern District of Georgia and elsewhere, the defendant did knowingly travel into the United States for the purpose of engaging in illicit sexual conduct with another person, in violation of 18 U.S.C. § 2423(b).

Count Two of the Indictment alleges that beginning on or about August 1, 2011, and continuing until on or about April 14, 2012, in the Northern District of Georgia and elsewhere, the defendant, using facilities and means of interstate commerce, that is, a computer connected to the Internet and a mobile telephone, knowingly attempted to persuade, induce, entice, and coerce an individual who had not attained the age of 18 years to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, child molestation (O.C.G.A. § 16-6-4), in violation of 18 U.S.C. § 2422(b).

## III.   ANALYSIS

Defendant Hine challenges through these two motions certain statements he made to law enforcement and the warrantless search of his suitcase, backpack, and cellular telephone. The Government responds that (1) it provided the Miranda warnings to Mr. Hine before he was questioned and he freely and voluntarily waived those rights, and (2) the defendant voluntarily provided consent for the searches.

### A.     The Motion to Suppress Statements

The Supreme Court in Jackson v. Denno, 378 U.S. 368, 376-77 (1964), held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury.  Title 18 U.S.C. § 3501(a) codifies the Jackson v. Denno requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness."  United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (quoting 18 U.S.C. § 3501(a)).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement.  First, the Court must consider whether the Government complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966).  Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary.  United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam).

8

### 1.     Compliance with *Miranda*

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

The testimony at the hearing showed that Agent Childers advised Mr. Hine of his Miranda rights and obtained confirmation that he understood his rights. Indeed, defendant concedes that "it is undisputed that SA Childers read Mr. Hine his Miranda rights and Mr. Hine indicated he understood them." (Def.'s Br. 3.) Therefore, defendant received notice of his rights before he was subjected to interrogation and made any incriminating statements.

9

### 2. **Voluntariness**

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. Jones, 32 F.3d at 1516. In Arizona v. Fulminate, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. Jones, 32 F.3d at 1516-17. Several non-exhaustive factors help assess voluntariness, including "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by the police." Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003). While the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent." United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (citations omitted).

In this case, the Court finds that defendant is of at least average intelligence. He was able to communicate by email and text and arrange international travel. His

10

interrogation was polite and non-confrontational. No physical force was used against him, and no promises or inducements extended. Mr. Hine was aware of his rights and of the consequences of relinquishing those rights.

Despite these undisputed facts, defendant argues that he was never asked if he was willing to waive his rights. (Def.'s Br. 3.) While Mr. Hine did not specifically state, "I waive my rights," the Court agrees with the Government that the law does not require such a specific waiver. "[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Berghuis v. Thompkins, 560 U.S. 370, 130 S. Ct. 2250, 2262 (2010). Thus, "[a]lthough Miranda imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a Miranda warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." Id. (citation omitted). Thus, "a waiver of rights can be implied from the actions and words of the person being questioned. For example, if after being advised of his rights an individual responds willingly to questions without requesting an attorney, waiver may be implied." United States v. Chong, 829 F.2d 1572, 1574 (11th Cir. 1987); see also United States

11

v. Grant, No. 1-09-CR-482-TWT-LTW, 2011 WL 2580867, at *8 (N.D. Ga May 4, 2011) (Walker, M.J.) (defendant's election to respond to questioning in interview room demonstrates an implied waiver of Miranda rights).

In this case, Mr. Hine understood the Miranda rights and clearly waived them when he responded to questions from the agents and officers.  Accordingly, the undersigned **REPORTS** that, under the totality of the circumstances, defendant made a free and rational choice to provide statements, and therefore **RECOMMENDS** that his Motion to Suppress Statements be **DENIED**.

### B.     The Motion to Suppress Seized Evidence

Police officers may search, without a warrant or probable cause, areas that are protected by the Fourth Amendment if they obtain the possessor's voluntary consent to search.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  The government bears the burden of proving both the existence of consent and that the consent was given freely and voluntarily.  United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993).  "The voluntariness of the consent must be judged in the light of the totality of the circumstances."  United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995).

12

In determining the voluntariness of consent, a reviewing court must examine several non-exclusive factors, such as: (1) whether Mr. Hine was free to leave; (2) whether there was coercive police procedure; (3) the extent of Mr. Hine's cooperation or awareness of a right to refuse to consent; (4) whether Mr. Hine could refuse to consent; (5) the extent of Mr. Hine's education and intelligence; and (6) Mr. Hine's belief that no incriminating evidence would be found. See United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002); see also United States v. Gonzalez, 71 F.3d 819, 830-31 (11th Cir. 1996).

The Court finds that, under the totality of the circumstances, Mr. Hine freely and voluntarily consented to the search of his personal belongings. Agent Childers gave Mr. Hine two consent forms–the first describing the property to be searched as a black backpack and a black suitcase, and the second describing a cellular telephone. (Tr. 17; see also Gov't Exs. 2-3.) Mr. Hine read the consent forms, each of which contained before the signature lines an acknowledgment that no promises or threats had been made to compel consent and that consent was freely and voluntarily given. (See supra note 5.)

With regard to the factors identified in Ramirez-Chilel, although Mr. Hine was under arrest, there were no coercive police procedures and he was cooperative at all

13

AO 72A
(Rev.8/82)

times.  Further, as previously discussed, Mr. Hine demonstrated his intelligence by procuring paperwork necessary for international travel, and to communicate via email and text messaging.  He did not appear sleepy or under the influence of any substance when he executed the consent to search forms.

Mr. Hine argues that he merely acquiesced to a claim of lawful authority because he was unaware of his right to refuse consent. (Def.'s Brief 4-5.) However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the sine qua non of effective consent.'"  United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)); accord United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) ("the government is not required to prove that the defendant knew he had the right to refuse to consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); see also United States v. Mejia, 720 F.2d 1378, 1381 (5th Cir. 1983) ("'[T]he defendant need not be informed specifically of his Fourth Amendment rights . . ., nor must the investigating officer state that he will refrain

14

from searching if the defendant refuses to give permission.'") (quoting United States v. Horton, 488 F.2d 374, 380 (5th Cir. 1973)).[7]

Given the lack of any coercive behavior on the part of the arresting agents and officers, the mere fact that the defendant was not informed of his right to refuse consent is insufficient to render his consent involuntary. See Zapata, 180 F.3d at 1241; see also United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973) ("[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.").

Mr. Hine also argues that, because he is not an American citizen, he would not be presumed to be aware of his right to refuse. (Def.'s Br. 4.) This argument fails, however, to establish that Mr. Hine's consent was involuntary. Where the defendant is a foreign national, the court should also determine voluntariness

> by examining, among other things, whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant appeared to understand those rights; whether the defendant had the assistance of a translator; whether

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

> the defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system.

United States v. McCarty, 835 F. Supp. 2d 938, 952-53 (D. Haw. 2011) (quoting United States v. Amano, 229 F.3d 801, 804-05 (9th Cir. 2000)).

In McCarty, the defendant, a national from the United Kingdom, signed a consent form allowing police to search his luggage at an airport. 835 F. Supp. 2d at 940. Like the instant case, the defendant filed a motion to suppress evidence obtained from a search of his luggage, contending that he did not give valid consent. Id. According to the defendant, he was not familiar with the laws of the United States and believed he was obligated to sign the consent forms. Id. at 948-49. After considering the above-listed factors, the court concluded that the defendant's consent was intelligent and voluntary, noting the written waiver was in his native language, which he appeared to understand. Id. at 953; see also United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (no showing that the defendant's foreign background in Jamaica made him unfamiliar with his legal rights).

Similarly, in Mejia, the defendant, a Colombian national, asserted that his consent to abdominal X-rays was involuntary because the interrogator did not inform him of his right to refuse consent. 720 F.2d at 1380. The Fifth Circuit affirmed a

16

finding that his consent was voluntary, and noted that notwithstanding the fact that the defendant only spoke Spanish, the consent form was printed in Spanish, and he was apparently aware of that to which he was consenting. Id. at 1381.

In this case, Mr. Hine signed two consent forms written in English, his native language. Mr. Hine does not argue that he was confused or that he did not understand the agents' request or the consent forms. (The evidence would not support such an argument.) Mr. Hine's intelligent interaction with the agents and offices throughout this multi-hour encounter indicates that he was capable of understanding that they were requesting consent to search. Defendant's purported lack of knowledge of a right to refuse did not preclude him from making a voluntary consent to search the backpack, suitcase, and cellular telephone. Mr. Hine cites no authority that, as a foreign national, he must be told of his right to refuse before consent can be valid. To the contrary, "[t]o the extent [the defendant] suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had the right to refuse consent, [the Eleventh Circuit] has squarely rejected this argument." United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004).

The objective circumstances surrounding the signing of the forms clearly indicate that Mr. Hine gave consent to search, and that consent was not a function of acquiescence to a claim of lawful authority, but rather given freely and voluntarily. The undersigned thus **REPORTS** that, viewed in the light of the totality of the circumstances, defendant voluntarily consented to the search of his personal property; therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Seized Evidence be **DENIED**.

## IV.   CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS** that defendant Geoffery William Hine's Motion to Suppress Statements [15] and Motion to Suppress Seized Evidence [16] be **DENIED**.

**SO RECOMMENDED**, this 1st day of July, 2013.

_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE